UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                :

UNITED STATES OF AMERICA

                                :

    -v-

                                :      13 Cr. 275 (AKH)

JASON KONIOR,

                                :

            Defendant,

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## GOVERNMENT'S SENTENCING MEMORANDUM


                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York
                                        Attorney for the United States
                                              of America


John T. Zach
Assistant U.S. Attorney

   -Of Counsel-

The Government submits this Sentencing Memorandum to briefly respond to certain arguments made by Jason Konior in his sentencing submission dated April 17, 2014. In those papers, the defendant argues that he should receive a non-custodial sentence for his participation in a multi-million dollar fraud that has severely harmed the financial well-being of those who placed their trust in him. The Government respectfully submits that Konior's request should be denied. Konior stole money and lied to individuals who entrusted their money to him so that he (Konior) could keep his business afloat. His conduct was flagrant and intentional and he should be held responsible for his actions with a sentence within the applicable Sentencing Guidelines range in this case.

## THE OFFENSE CONDUCT

Jason Konior was the founder and manager of a number of related financial services business entities in New York City, herein referred to as "Absolute." (Presentence Investigation Report, dated February 4, 2014 (the "PSR"), at ¶¶ 7-10). From late 2011 through May 2012, Konior misappropriated at least $2.9 million in funds that he had solicited from hedge fund investors. (PSR ¶ 12; Plea Agreement, dated July 8, 2013, at 2). He represented to these investors that Absolute would provide additional trading funds of up to nine times the investment they made in Absolute. As part of Absolute's "first loss" investment program, Konior claimed that he would place the combined funds—the investors' funds and the additional funds to be provided by Absolute—in a brokerage account designated by Absolute. According to Konior, the hedge fund investors would then be able to trade securities utilizing that brokerage account. Under the arrangement, the hedge funds would be responsible for trading losses, and they would share any profits with Absolute. (PSR ¶¶ 14-15). However, instead of establishing brokerage accounts for the victim hedge funds, however, Konior misappropriated the funds they provided

by paying redemptions to prior investors, making payments to himself, and paying various personal and business expenses. (*Id.* ¶ 12).

To carry this scheme out, Konior told numerous flagrant lies to his victims.  In e-mails, text messages, and telephone conversations, Konior pretended that he was establishing brokerage accounts for three hedge fund investors, when, in fact, he had already stolen their money. For example, as set forth in the PSR, Konior exchanged many emails with a victim assuring the victim that he was about to provide them with access to their funds.  (*Id.* ¶¶ 24-28).  In email after email, Konior made assurances to this victim (e.g., an email from Konior claiming that "this [the purported trading platform] should be up and running today-tmw," (*id.* ¶ 27)).  The truth of the matter was that by the time Konior was making these representations, he had already long ago diverted the victim's funds.  (*Id.* ¶¶ 31-32).  Thus, Konior kept on lying to the victim for months while still collecting money from other victims.

Likewise, in connection with another victim, Konior embarked on a similar mission to repeatedly lie about the money that he had stolen.  This victim sent Konior approximately $300,000 in March 2012 and then repeatedly contacted Konior to see if the money had been placed in a brokerage account.  (*Id.* ¶ 39).  Konior kept reassuring the victim that the money was safe (*id.*), when in fact he had already diverted it for another use, (*id.* at ¶¶ 45-47).  As part of his lies to this investor, Konior received a text message from the victim stating, "I want my money back. What did you do to it anyway? Are you going to tell me or do you want the SEC to find out?" (*Id.* ¶ 40).  Konior responded with a text message, stating, "We have your funds in our acct. Where else would they be?" (*Id.*)  At the time Konior wrote the message, he had already used that hedge fund's investment to pay off other investors and his own expenses.

## ARGUMENT

The Government writes to briefly address three issues raised by Konior in his submission.

First, Konior's crimes were far more serious than what he describes in his papers. In his sentencing submission, Konior describes his "tragic decision" in this case as "continu[ing] to raise funds from new investors without disclosing the shortfall, and us[ing] the new investors' funds to pay off old investors and fund expenses including compensation." (Def. Br. at 6). That is not the whole story; Konior did more than simply not disclose a shortcoming of funds in his business. Konior explicitly lied to his clients and induced them to hand over their money so he could misappropriate it. Konior told his victims, as set forth above, that the funds they were giving to him were going to be placed in brokerage accounts. He then almost immediately diverted those funds. After that, Konior continued to lie to his victims and mislead them about their funds even as he was taking in new money from other victims, from whom he also intended to steal. This is not a minor moral lapse, but is instead the flat out stealing of millions of dollars.

Moreover, the victims Konior was defrauding in this case were modest entrepreneurs who were attempting to start investment businesses of their own. Most of the victims had secured start-up funds from their friends and family, and it was those relatively modest pools of money that the victims entrusted to Konior. These victims are now at a near complete loss of their capital and their dreams of starting their own investment businesses have been dashed.

Second, in his sentencing memorandum, Konior claims that he has exhibited a form of "extraordinary acceptance of responsibility" (Def. Br. at 6) and that this conduct bolsters his request for a non-custodial sentence. The Government disagrees. Konior's agreement to speak candidly with the Securities and Exchange Commission (the "SEC") was not some altruistic act, but rather was a rational decision to make given the dire circumstances that he was in.

3

In 2012, the SEC received information about possible misconduct being engaged in by Konior at Absolute. The SEC immediately started an investigation and subpoenaed Konior. That Konior complied with the subpoena and produced documents relating to his business is hardly exemplary conduct. It is what the law requires. It is true that he did not assert his Fifth Amendment rights with the SEC, but had he invoked the Fifth Amendment with the SEC, they simply would have subpoenaed his formal testimony and obtained an adverse inference against him in their case. The Government does not mean to belittle Konior's conduct – he, in fact, provided the SEC with information about his crimes as many defendants do. But that information was provided after he had defrauded his clients out of millions of dollars and after the SEC had initiated its investigation. There was nothing extraordinary about his conduct – he knew that he was caught and he understood that being obstructionist would only make things worse.

Further, the suggestion that Konior should receive some credit for his attempt to become a cooperating witness in the criminal context (Def. Br. at 7) is wrong. The Government did not sign Konior up to any sort of cooperation agreement and he has not provided any substantial assistance. Rather, at the request of Konior's attorney, the Government met with counsel and listened to counsel's proposal for cooperation. These types of meetings are a typical practice in criminal cases. Indeed, it would not be an exaggeration to say that where respected and experienced counsel, such as Konior's attorney in this case, requests such a meeting, the Government will almost always hear them out. Such meetings do not, however, amount to extraordinary cooperation on the part of a defendant. They are nothing more than a routine attempt by an attorney to achieve a more favorable outcome for his client. The Government

elected not to enter any cooperation agreement with Konior in this case and he is not entitled to any leniency for sending his lawyer in to have a meeting with the Government.

<u>Third</u>, with respect to the additional criminal history point awarded by the Probation Office in the PSR, the Government agrees with Probation's analysis. (PSR at 25). However, as defense counsel points out, this additional point is not contained in the plea agreement between the parties in this case. The Government respectfully submits that a sentence within the Sentencing Guideline's Range as set forth in the plea agreement – that is, a sentence within the Sentencing Guidelines Range of 46 to 57 months would be reasonable. The sentence recommended by Probation would also fall within that range.

## CONCLUSION

For the reasons set forth above, and in particular because of Konior's intentional and affirmative lies to his victims, the Government respectfully submits that a sentence within the applicable Sentencing Guidelines Range in in this case is appropriate.

Dated: New York, New York
        May 6, 2014

                        Respectfully submitted,

                        PREET BHARARA
                        United States Attorney
                        Southern District of New York

            By:    _____/s/_____
                        John T. Zach
                        Assistant United States Attorneys